UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
MIGUEL LAWRENCE,

                                    Plaintiff,

                                                                    **OPINION & ORDER**

            - against -
                                                                     No. 18-CV-2537 (CS)

CHEMPRENE, INC., ANTHONY PATINELLA,
and SUSAN GARRISON,

                                    Defendants.
--------------------------------------------------------------x

Appearances:

Jimmy M. Santos
Law Offices of Jimmy M. Santos, PLLC
Cornwall, New York
*Counsel for Plaintiff*

Robert F. Manfredo
Mara D. Afzali
Bond, Schoeneck & King, PLLC
Albany, New York
*Counsel for Defendants*

Seibel, J.

        Before the Court is Defendants' motion for summary judgment.  (Doc. 62.)

## I.      **BACKGROUND**

        The following facts are based on the Defendants' Local Civil Rule 56.1 Statement and

Plaintiff's Response and are undisputed except as noted.

## A.    <u>Facts</u>

### 1.    <u>Allegations of Discrimination in the Workplace</u>

Plaintiff Miguel Lawrence began working for Defendant Chemprene, Inc., ("Chemprene"), in the early 1990s.  (Doc. 78 ("P's 56.1 Resp.") ¶ 1.)[1]  During the relevant period, Plaintiff worked in the mixing department and held the title of "Chemical Warehouse Group Leader."  (*Id.*)

In December 2007, Plaintiff told his supervisor, George Dionysius, that a coworker named Alba Arvelo told Aswad Simmons, another employee in the mixing department, "[T]ell that black [motherfucker] to order bags," in reference to Plaintiff.  (*Id.* ¶¶ 12-13 (second alteration in original).)  Dionysius told Plaintiff to report the incident to Human Resources ("HR"), which Plaintiff did.  (*Id.* ¶ 15.)  Arvelo was terminated a day or two later.  (*Id.*)

On an unspecified date, Plaintiff complained to Defendant Susan Garrison, Chemprene's Production Supervisor, (*id.* ¶ 3), about another coworker named Jorge Rodriguez.  (*Id.* ¶ 18.)  Plaintiff told Garrison that Rodriguez was loitering in the mixing department, and Garrison agreed that Rodriguez should not be spending time there.  (*Id.*)  Garrison investigated the incident and learned that Plaintiff and Rodriguez had a history of conflict, including an incident for which Rodriguez was formally reprimanded in 1998.  (*See id.* ¶¶ 19-20.)  Garrison spoke with HR and with Defendant Anthony Patinella – who oversaw several departments including

---

[1] In a number of Plaintiff's 56.1 responses, he denies Defendants' assertion in its entirety, but in the body of the denial, addresses only a portion of the Defendants' assertion.  Local Civil Rule 56.1(c) provides that each statement of fact put forth by the movant "will be deemed to be admitted for purposes of the motion unless specifically controverted . . . by the opposing party."  Further, "[m]ere assertions, unsupported by any affirmative and specific evidence, are insufficient to raise a genuine issue of material fact for trial."  *Tycoons Worldwide Grp. (Thai.) Pub. Co. v. JBL Supply Inc.*, 721 F. Supp. 2d 194, 202 (S.D.N.Y. 2010).  Accordingly, where Plaintiff denies an assertion, but provides evidence to support only a portion of that denial, the remainder of Defendants' assertion will be deemed admitted for purposes of this motion.

the mixing department, (*id.* ¶ 2) – about "the prior history between Plaintiff and Rodriguez and suggested that Rodriguez be kept out of [the mixing] department," (*id.* ¶ 21). Defendants assert that Patinella was not made aware of any acts of racial discrimination or harassment directed at Plaintiff by Rodriguez. (*Id.* ¶ 22.) Plaintiff disputes this assertion, stating:

> Rodriguez told Plaintiff that Patinella had called [Plaintiff] a "stupid nigger" and that Patinella could not wait to get rid of [Plaintiff], *i.e.*, terminate, his employment. Plaintiff told this [to] defendant Garrison and [Mary Kathryn ("Katie")] Sens[2] and either Garrison and/or Sens stated that they would notify defendant Patinella to schedule a meeting, which never took place.

(*Id.* (citing Doc. 73 ("Lawrence Decl.") ¶¶ 18-20).)[3]

The allegation in Plaintiff's declaration that, according to Rodriguez, Patinella referred to Plaintiff using a vile slur is contradicted by Plaintiff's deposition testimony. There Plaintiff made it clear that Rodriguez reported only that Patinella had said that Plaintiff was stupid and on thin ice and that Patinella wanted to get rid of him, whereas it was Rodriguez, not Patinella, who called Plaintiff a "stupid nigger." (Doc. 63 ("Manfredo Decl.") Ex. 1 ("Lawrence Depo.") at 42:23-46:7.) "It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987); *see Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014) "[F]actual issues that a party creates by filing an affidavit crafted to oppose a summary judgment motion that contradicts that party's prior testimony are not

---

[2] Sens was Chemprene's Director of HR from 2008 through January 2016. (P's 56.1 Resp. ¶ 4.)

[3] Defendants contend that because of a medical issue, Patinella could not use the stairs to go to Plaintiff's area of the plant to meet with him, so Patinella asked Plaintiff to come to Patinella's area, which Plaintiff never did. (P's 56.1 Resp. ¶ 98.)

'genuine' issues for trial.").   I therefore disregard the claim in Plaintiff's affidavit that Rodriguez said that Patinella used the slur.

Toward the end of July 2014, an unidentified Chemprene employee reported to Sens that another employee from the mixing department, Robert Kiene, had used a derogatory word when referring to a Latino coworker.  (P's 56.1 Resp. ¶ 34.)  Sens investigated the allegation, and although she was unable to corroborate it, she issued a written warning to Kiene.  (*Id.* ¶ 35.)  Only a few days later, Simmons reported to Garrison that Kiene had drawn a penis on a compounding bag in the mixing department.  (*Id.* ¶ 37.)  Plaintiff testified that the drawing was of a penis on a black man, (*see* Lawrence Depo. at 148:22-24 ("[H]e dr[e]w a man, a black guy, a black individual with a black marker with the penis.")), but Simmons stated that the drawing was just a penis without a body, (P's 56.1 Resp. ¶ 38.)  Defendants state that "[n]either Simmons nor anyone else in the mixing department told Garrison that they felt this picture was racially or sexually discriminatory or harassing."  (*Id.* ¶ 37.)  Plaintiff, however, denies this statement in part and asserts that Simmons "went to HR about a racist incident involving Kiene but nothing was done."  (*Id.*)[4]  Kiene was written up and suspended for two-and-a-half days.  (*Id.* ¶ 39.)

In May 2015, after receiving a complaint from an unidentified employee, Sens and Garrison conducted an investigation and discovered that Kiene had made a sexually inappropriate comment about an employee's daughter and made a statement to the effect of "the police should shoot all the blacks."  (*Id.* ¶¶ 40-41.)  Garrison also noted that "[t]he general

---

[4] Plaintiff's statement is not entirely accurate, though it is somewhat supported by Simmons's declaration.  Simmons attested, "I went to HR concerning a racist comment made towards [Plaintiff] and I, nothing was done."  (Doc. 74 ("Santos Decl.") Ex. F ("Simmons Decl.").)  It thus appears Simmons did complain to HR about Kiene engaging in some sort of discrimination against Plaintiff, but it is unclear whether Simmons was complaining about the drawing of a penis or a discriminatory statement.  If the latter, it is unclear what this discriminatory statement was.

consensus from the operators was that we are dealing with someone who uses vulgar language and makes sexually explic[it] comments that we are offended by, as well as racist remarks." (*Id.* ¶ 44.) During their investigation, Sens and Garrison spoke with Plaintiff, who confirmed the statements had been made. (*Id.* ¶ 42.) Sens and Garrison also spoke with seven other employees, six of whom confirmed Kiene's racist and sexist comments. (*Id.*) Only one employee, Larry Smith, denied that Kiene made the statements. (*Id.*) Sens and Garrison later determined that Smith had been condoning Kiene's behavior and not performing job duties assigned to him. (*Id.*) Both Kiene and Smith were terminated on May 15, 2015. (*Id.* ¶ 45.)

On an unspecified date, Plaintiff told Garrison that Mark Ford, another Chemprene employee, "did not know what he was doing in the performance of his job duties." (*Id.* ¶ 26.) Then, in August 2016, Plaintiff complained to Garrison that Ford had been assigned to clean an area called "the pit," but Ford told coworkers that he was not going to do so. (*Id.* ¶ 27.) Plaintiff states that Ford wrote on the "assignment sheet of paper . . . something to the effect of – 'that's a nigger job.'" (*Id.* ¶ 29.) Plaintiff states that he complained about this to Garrison and Christina Myers, Chemprene's Director of HR and Environmental Health Safety. (*Id.*; *see id.* ¶ 5.) Plaintiff further asserts that "Garrison and/or Myers" told Plaintiff that they would speak to Patinella about Ford's discriminatory behavior. (*Id.* ¶ 29.) No such meeting occurred before Plaintiff was fired on September 21, 2016. (Lawrence Decl. ¶¶ 32-33.) Defendants acknowledge that Plaintiff and Garrison met regarding Ford, but they state that Plaintiff did not report to Garrison that Ford had used racial slurs or racially derogatory language. (*See* P's 56.1 Resp. ¶ 29)[5]

---

[5] After Plaintiff was terminated, another employee complained that Ford used the N word. (P's 56.1 Resp. ¶ 31.) Patinella issued Ford a "Memorandum of Corrective Action," and Ford was required to review Chemprene's Anti-Harassment Policy. (*Id.* ¶ 32.)

Shortly after Plaintiff's conversation with Garrison about Ford, Plaintiff met with Myers "in connection with a climate survey of the mixing department." (*Id.* ¶ 30.) "The purpose of the survey was to understand the employee dynamics and improve communication and efficiencies within the department." (*Id.*) Defendants assert that the survey was in part held to address Plaintiff yelling at coworkers, but Plaintiff denies ever yelling at any coworkers. (*Id.*) Plaintiff does not, however, deny that other employees had complained to Patinella about Plaintiff yelling at them. (*Id.* ¶ 79.) During the meeting with Myers, Plaintiff complained that there was favoritism toward Ford, among others, within the mixing department. (*Id.* ¶ 30.) Plaintiff did not complain of discrimination. (*Id.*)

### 2. Department of Transportation Safety Training and Plaintiff's Termination

Piotr Sowa was Chemprene's Environmental Health and Safety Manager from September 2013 until January 2017. (*Id.* ¶ 6.) As part of his job, Sowa scheduled safety training programs, including the Department of Transportation Hazardous Materials Training (the "Training"). (*Id.* ¶ 46.) During the summer of 2016, Sowa scheduled the Training for September 15, 2016. (*Id.* ¶ 48.)[6] Sowa determined that Plaintiff had to attend the Training because his job required him to receive and ship hazardous materials and these aspects of the job were subject to Department of Transportation regulations. (*Id* ¶¶ 48-51.) Sowa distributed a training announcement to various department heads and posted the announcement on bulletin boards throughout the facility. (*Id.*

---

[6] Defendants' 56.1 Statement and Plaintiff's Response both state that the date of the training was September 15, 2015, but based on the logical chronology of events, as well as Sowa's affidavit, (Doc. 69 ("Sowa Aff.") ¶ 5), it is clear that they mean September 15, 2016.

¶¶ 53-54.) Plaintiff saw the Training announcement on the bulletin board prior to the Training. (*Id.* ¶ 54.)

Defendants state that in or around July 2016, Plaintiff told Garrison that he was not going to attend the Training. (*Id.* ¶ 55.) Defendants further state that Plaintiff told Dionysius that he was not going to attend the Training. (*Id.* ¶ 56.) Plaintiff denies telling anyone that he would not go to the Training, (*id.* ¶¶ 55-56), but it is undisputed that Plaintiff expressed "concerns" about the Training, Garrison checked with Patinella regarding those concerns, and Patinella told Garrison to ask Sowa whether Plaintiff needed to attend, (*id.* ¶ 57). Sowa confirmed that the Training was mandatory for Plaintiff because it was required every three years, (*id.*), and Plaintiff had not been since September 2012, (*id.* ¶ 52). On July 27, 2016, Sowa emailed Plaintiff stating, "I wanted to answer your question about the need of DOT Training for you. Please see the quote from DOT regulations below. All employees who load[] or unload[] Hazardous Materials are required to receive initial and 3 year refresher training. . . . I hope this answers your question." (Sowa Aff. Ex. 1; *see* P's 56.1 Resp. ¶ 58.)[7] After Sowa sent the email to Plaintiff, Garrison assumed that Plaintiff understood that the Training was mandatory and that Plaintiff planned to attend. (P's 56.1 Resp. ¶ 59.)

A few days before the training, Simmons overheard Plaintiff telling Dionysius that Plaintiff was overloaded with work, but Dionysius told Plaintiff that the Training was

---

[7] Plaintiff "does not recall being personally informed that he had to attend the [Training]." (P's 56.1 Resp. ¶ 58.) Arguably Plaintiff thereby concedes he was notified electronically, but in any event, Plaintiff's "failure to recall . . . is insufficient to create a genuine dispute of material fact." *Maioriello v. N.Y. State Office for People with Developmental Disabilities*, 272 F. Supp. 3d 307, 334 (N.D.N.Y. 2017) (collecting cases), *appeal dismissed*, No. 17-3508 (2d Cir. Dec. 5, 2017). Accordingly, it is undisputed for the purposes of this motion that Plaintiff was informed that he had to attend the Training.

mandatory. (*Id.* ¶ 60.)[8] Simmons stated that there was anticipation among the employees in the mixing department to see whether Plaintiff would attend the Training. (*Id.*)

On September 15, 2016, Plaintiff did not show up at the start of the Training. (*Id.* ¶ 61.) Sowa tried contacting Plaintiff but was unsuccessful, so Sowa notified Myers. (*Id.*) Myers contacted Garrison, and Garrison told Patinella that Plaintiff was not at the Training. (*Id.* ¶ 62.) Patinella then told Dionysius to find Plaintiff and instruct him to get to the Training. (*Id.* ¶ 63.) Defendants state that Dionysius explained to Patinella that Plaintiff had previously said that he would not go to the Training, but Plaintiff denies ever making such statement to Dionysius. (*Id.*) Patinella then used the facility's intercom system to page Plaintiff, and Plaintiff called Patinella back. (*Id.* ¶ 64.) Patinella told Plaintiff that he had to go to the Training, but Plaintiff hung up on Patinella. (*Id.*) Dionysius was standing next to Plaintiff during this call, and Dionysius heard Plaintiff say, "I'm not going," but Plaintiff denies making this statement. (*Id.* ¶ 65.)

About ten to fifteen minutes after Plaintiff hung up on Patinella, Plaintiff still had not shown up at the Training. (*See id.* ¶ 66.) Patinella then paged Plaintiff a second time and Plaintiff called back. (*Id.*) Plaintiff states that when Patinella paged a second time, Plaintiff was on his way to the Training. (*Id.*) During the second call, Patinella told Plaintiff that he had to report to the Training immediately, and Defendants state that Plaintiff still refused, but Plaintiff denies doing so. (*Id.* ¶ 67.) Patinella told Plaintiff that he was being insubordinate and, as a result, Plaintiff was suspended for three days and ordered to leave work, (*id.*), but Plaintiff denies being told that he was being insubordinate, (*id.* ¶ 77). Defendants state that Plaintiff said he was not going to leave the plant and Patinella could not force him to do so, which Plaintiff also

---

[8] For the reasons stated in note 7, this statement is undisputed for the purposes of this motion.

denies saying.  (*Id.* ¶ 70.)  Garrison heard Patinella say to Plaintiff, "What do you mean you're

not going to leave?  If you want to do it that way, I'll just call the police and have them escort

you out of the building, so just get your stuff and go home," but Plaintiff denies saying he would

not leave.  (*Id.* ¶ 71.)

Despite being told to leave the building, Plaintiff went to HR to get a memo regarding the

incident.  (*See id.* ¶¶ 72-73.)  HR gave Plaintiff a written suspension notice, which stated the

following:

> On 9/5/16 Tony Patinella called [Plaintiff] and requested that he go down to the
> front conference area to attend a HAZMAT training class.  [Plaintiff] stated that he
> had already attended one, so he did not need to go.  [Patinella] then advised
> [Plaintiff] that the training is a refresher course and as the Team Lead for the
> Chemical Warehouse, his attendance was mandatory.  Still, [Plaintiff] refused, and
> hung up on [Patinella].

(Doc. 65 ("Garrison Decl.") Ex. 6 ("Disciplinary Memo").)  Patinella and Myers signed the

Disciplinary Memo, but Plaintiff did not.  (*Id.*)  An unknown employee handwrote on the

Disciplinary Memo, "Employee refused to sign corrective action.  Employee left premises after

administering."  (*Id.*)  Plaintiff does not dispute any of the aforementioned, except he states that

the Disciplinary Memo inaccurately reflects that Plaintiff refused to go to the Training.  (P's 56.1

Resp. ¶ 75.)

Either later on September 15, 2016, or shortly thereafter, Patinella told Myers that he

believed Plaintiff's conduct was insubordinate in violation of Chemprene's Employee

Handbook, (*id.* ¶ 77),[9] and that Plaintiff should be fired, (*id.* ¶ 80).  Myers asked Patinella and

---

[9] The Handbook has a provision that states:

Respect is mutual and all employees are expected to treat each other in a respectful
manner.  If an employee is asked to perform a job or task by a group leader, supervisor or
manager and refuses it is considered to be insubordination and it will not be tolerated.

Garrison to provide written statements regarding the September 15, 2016 incident, which they did. (*Id.*) Patinella's statement noted that Plaintiff refused to attend the training and refused to leave the plant after being told to do so. (*See id.* ¶ 81.) Myers then agreed with Patinella that Plaintiff should be terminated. (*Id.* ¶ 82.) On September 21, 2016, Myers and Patinella gave Plaintiff a Memorandum of Corrective Action that Myers had prepared, terminating Plaintiff for insubordination. (*Id.* ¶ 83.)[10]

When Plaintiff was given his termination notice, he did not allege that the termination was retaliatory or based on his race. (*Id.* ¶ 84.) Neither Patinella nor Garrison used a racial slur or derogatory language when giving Plaintiff his termination notice or at any other time. (*Id.* ¶¶ 100-101.)

Plaintiff states that he was the only employee terminated for not attending the Training. (*Id.* ¶ 103.) In addition to Plaintiff, Keith Scofield, Jesse Wood, and Aaron Yerks did not attend the Training despite being on the Training Announcement sheet. (*Id.* ¶¶ 104-105.) Neither Defendants' 56.1 Statement nor Plaintiff's response reference the race of these individuals. Schofield and Yerks did not transport hazardous material, so they were not required to go to the Training, and Wood had a prescheduled vacation on September 15, 2016, so he was permitted to complete the Training online. (*Id.* ¶ 105.)

---

Failure to perform a job or task as directed could result in discipline up to and including termination.

(Doc. 66 ("Myers Decl.") Ex. 6.) Plaintiff was familiar with Chemprene's policy on insubordination. (P's 56.1 Resp. ¶ 85.)

[10] Plaintiff denies every assertion in this paragraph, but his denials do not address the assertions directly; rather Plaintiff reiterates that he never refused to attend the Training, never said he would not go to the training, and was not otherwise insubordinate. (*See* P's 56.1 Resp. ¶¶ 77-83.)

### B. **Procedural History**

On March 21, 2018, Plaintiff filed his Complaint against Chemprene, Patinella, John Nicoletti, Dionysius, Ford, Rodriguez (incorrectly spelled George Rodriquez), Garrison, Myers, and Valerie Lupino. (Doc. 1.) Defendants answered, (Doc. 39), and the parties engaged in discovery. On August 3, 2018, Plaintiff agreed to move forward only against Defendants Chemprene, Patinella, and Garrison, and the remaining Defendants were dismissed, (*see* Minute Entry dated Aug. 3, 2018; Docket Entry dated Aug. 3, 2018), leaving the following claims: (1) discrimination and hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), against Chemprene; (2) discrimination and hostile work environment under 42 U.S.C. § 1981 against Chemprene; (3) discrimination and hostile work environment under New York State Executive Law §§ 290, *et seq.* ("NYHRL"), against all Defendants; (4) retaliation under Title VII against Chemprene; (5) retaliation under § 1981 against Chemprene; and (6) retaliation under NYHRL against all Defendants, (*see* Doc. 1 ¶¶ 52-64).

On March 15, 2019, Defendants filed a pre-motion letter, (Doc. 53), to which Plaintiff replied on March 22, 2019, (Doc. 54), and on March 29, 2019, the Court held a pre-motion conference, (Minute Entry Mar. 29, 2019). During the conference, the Court set a briefing schedule for Defendants' motion for summary judgment, (*id.*), but both parties subsequently requested extensions, (Docs. 55, 57). After I granted the parties' extension requests, Defendants had until July 15 to serve their motion, Plaintiff had until August 23 to serve his opposition papers, Defendants had until September 6 to file their reply, and (because the parties chose to bundle their papers) all briefs were to be filed on the Court's Electronic Case Filing System on September 6. (Docs. 56, 58.)

On August 26, 2019, Defendants submitted a letter stating that Plaintiff had asked Defendants for a one-day extension to August 24 to file his opposition, to which Defendants agreed subject to the Court's approval. (Doc. 59.) Defendants' letter noted, however, that Plaintiff never filed an application with the Court and never served Defendants with his opposition papers. (*Id.*) In response to Defendants' letter, and despite his papers already being three days overdue, Plaintiff's counsel requested another extension to September 9 to serve his papers. (Doc. 60.) The Court denied Plaintiff's request and ordered Plaintiff to file his opposition that same day or Defendants' motion would be deemed unopposed. (Doc. 61.)

On August 26, 2019, Defendants filed their motion for summary judgment, 56.1 Statement, memorandum of law, (Doc. 71 ("Ds' Mem.")), and other supporting materials. Plaintiff filed his own declaration and an attorney's declaration with supporting exhibits, (Docs. 73-74), but did not file a 56.1 Response or a brief in opposition despite this Court's order for Plaintiff to file his "opposition" by the end of the day, (Doc. 61).

On August 27, 2019, Defendants filed a letter requesting the Court to consider their motion unopposed. (Doc. 75.) Plaintiff's counsel responded with a letter, including numerous citations, explaining why the motion should not be considered unopposed and requesting until the end of the day to serve his opposition papers. (Doc. 76.) The Court granted Plaintiff's request and ordered Plaintiff to file his papers "in full today or the motion will be deemed unopposed." (Doc. 77.) Plaintiff filed a 56.1 Response but did not file a memorandum of law.[11] On September 11, 2019, Defendants replied, addressing Plaintiff's 56.1 Response. (Doc. 79.)

_____

[11] As I stated on August 27, 2019, Plaintiff's counsel should consider that the time he spends writing letters trying to excuse his lateness would be better spent getting the client's work done. (Doc. 77.)

## II.    <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . .

admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

## III.     DISCUSSION

### A.     The Motion Is Unopposed

Plaintiff failed to serve full opposition papers despite multiple orders to do so. On two occasions, the Court explained to Plaintiff and his counsel that failure to file opposition papers would result in the Court deeming Defendants' motion unopposed, (Docs. 61, 77), yet Plaintiff still failed to submit a memorandum of law. Accordingly, I consider this motion unopposed.[12]

Federal Rule of Civil Procedure 56 does not, however, "allow district courts to automatically grant summary judgment on a claim simply because the summary judgment motion, or relevant part, is unopposed." *Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014). "'Even unopposed motions for summary judgment must fail where the undisputed facts

---

[12] This is not the first time in my experience that Mr. Santos has failed to properly oppose a motion. *See Holmes v. Astor Servs. for Children & Families*, No. 16-CV-2260, 2017 WL 3535296, at *3 (S.D.N.Y. Aug. 16, 2017) (Mr. Santos did not file opposition to summary judgment motion); *see also Flynn v. McCabe & Mack LLP*, No. 15-CV-5776, 2018 WL 794631, at *5 (S.D.N.Y. Feb. 8, 2018) (noting Plaintiff's opposition brief was stricken as untimely filed), *appeal withdrawn*, No. 18-701, 2018 WL 4348054 (2d Cir. July 13, 2018).

fail to show that the moving party is entitled to judgment as a matter of law.'" *City of N.Y. v. Gordon*, 155 F. Supp. 3d 411, 418 (S.D.N.Y. 2015) (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006)). Before entering summary judgment, the Court "must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production" and "determine whether the legal theory of the motion is sound," but "a partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims." *Jackson*, 766 F.3d at 194-95.

Despite Plaintiff's counsel's failure to properly oppose the motion, I will nevertheless consider those papers he did file (Plaintiff's declaration, counsel's declaration, and the Local Civil Rule 56.1 Response).

## B. Hostile Work Environment

Defendants argue that Plaintiff's hostile work environment claims should be dismissed because, among other things, Plaintiff has failed to allege that Defendants' conduct was sufficiently severe and pervasive. (Ds' Mem. at 11-16.) I agree.

"'To establish a hostile work environment claim . . . a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Davis v. N.Y. Dep't of Corr.*, 256 F. Supp. 3d 343, 350 (S.D.N.Y. 2017) (alteration omitted) (quoting *Rivera v. Rochester Genesee Regional Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014)); *see Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011) (hostile work environment standard "is essentially the same" for Title VII, § 1981, and NYHRL claims),

*reconsideration denied*, 982 F. Supp. 2d 225 (E.D.N.Y. 2013), *motion for relief from judgment denied*, No. 08-CV-3546, 2014 WL 12839299 (E.D.N.Y. Feb. 6, 2014).  "In considering whether a plaintiff has met this burden, courts should examine the totality of the circumstances, including:  the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance."  *Rivera*, 743 F.3d at 20 (internal quotation marks and alterations omitted).  The test is both objective and subjective:  "the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."  *Id.* (internal quotation marks omitted).  "Of course, it is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through other means, is actionable under Title VII only when it occurs because of an employee's *protected characteristic*, such as race or national origin."  *Id.* (internal quotation marks and alterations omitted) (emphasis in original).

While Plaintiff did not file a memorandum of law in opposition to Defendants' motion, Plaintiff's 56.1 Response, read in the light most favorable to him, includes the following allegations that go his hostile work environment claim:  (1) in December 2007, Plaintiff was told that Arvelo told Simmons, "[T]ell that black [motherfucker] to order bags," in reference to Plaintiff, (P's 56.1 Resp ¶¶ 13-14); (2) Rodriguez told Plaintiff that Patinella had called him a "stupid nigger," (*id.* ¶ 22);[13] (3) Kiene drew a penis on a mixing bag, (*id.* ¶ 37); Kiene made a statement to the effect of "the police should shoot all the blacks," (*id.* ¶ 41); and (5) Ford wrote

---

[13] Plaintiff does not allege that Rodriguez ever made discriminatory statements other than relaying that Patinella called Plaintiff a "stupid nigger."  (*See* P's 56.1 Resp. ¶ 23 (asserting only that Rodriguez relayed Patinella's statement but not that Rodriguez made any additional discriminatory comments).)

something to the effect of "that's a nigger job" on the sheet of paper assigning Ford to clean the pit, (*id.* ¶ 29). These allegations, however revolting they may be, fall short of establishing a hostile work environment.

Plaintiff's first allegation supporting his hostile work environment claim was a derogatory statement that he did not hear directly, but rather of which he learned from a coworker. He was told by Simmons that Arvelo called him a "black motherfucker." (P's 56.1 ¶ 13.) While secondhand statements "should not be ignored," such statements "are not as impactful on one's environment as are direct statements; consequently, they are less persuasive in stating a hostile work environment claim." *Sletten v. LiquidHub, Inc.*, No. 13-CV-1146, 2014 WL 3388866, at *7 (S.D.N.Y. July 11, 2014). Further, Defendant immediately fired Arvelo. (P's 56.1 Resp. ¶ 15.) Where the harasser is a non-supervisory coworker, the employer is not liable for that harassment unless it knew of the conduct and failed to take appropriate remedial action. *See Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir. 2000). Because Defendants took swift remedial action, Plaintiff cannot support his claim of hostile work environment with Arvelo's statement.

Plaintiff's second allegation is that Rodriguez told Plaintiff that Patinella called Plaintiff a "stupid nigger." (P's 56.1 Resp. ¶ 22.) As noted above, that allegation – which by Plaintiff's account was in any event also outside his presence – must be disregarded because it contradicts Plaintiff's deposition testimony.[14]

_____

[14] Plaintiff stated in his deposition that it was Rodriguez who used the slur, but there is no evidence that Plaintiff ever complained to Defendants about any racist slur originating with Rodriguez. (*See* P's 56.1 Resp. ¶ 23.)

Plaintiff's third allegation has to do with a penis drawn on a mixing bag, (*id.* ¶ 37), but Plaintiff failed to indicate how the drawing was discriminatory toward Plaintiff on account of his race. Rather, Plaintiff merely states that "[Simmons] went to HR about a racist incident involving Kiene but nothing was done," (*id.* ¶ 37), without providing a single detail regarding the incident, how it was racist, or how it injured Plaintiff. Perhaps the racist incident to which Plaintiff is referring is his fourth allegation – Kiene's statement that "police should shoot all the blacks" – but Plaintiff never makes that connection. In any event, Kiene was also terminated after a thorough investigation, so his misconduct cannot be attributed to Defendants.

Plaintiff's fifth allegation has to do with Ford writing the N word on an assignment sheet. (*Id.* ¶ 29.) While any use of that word is a despicable act, there is nothing in the record to suggest that the note was directed at Plaintiff. There is no evidence that Plaintiff assigned Ford to clean the pit, that Plaintiff created the assignment sheet that Ford defaced, or that Ford wrote the note for Plaintiff specifically, as opposed to writing it for the whole mixing department to see. While "racial epithets need not be directed at an employee to contribute to a hostile work environment," *Abdullah v. Panko Elec. & Maint., Inc.*, No. 08-CV-0579, 2011 WL 1103762, at *13 (N.D.N.Y. Mar. 23, 2011), "whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs," *Schwapp v. Town of Avon*, 118 F.3d 106, 110-11 (2d Cir. 1997) (internal quotation marks omitted), and the severity is reduced when the slur is not directed at the plaintiff himself, *see Hill v. Frontier Tel. of Rochester, Inc.*, No. 15-CV-6212, 2018 WL 1256220, at *6 (W.D.N.Y. Mar. 12, 2018).

In sum, Plaintiff has alleged one secondhand comment that cannot be attributed to Defendants, a racist remark that also cannot be attributed to Defendants, a lewd drawing, and one use of a racial epithet that was not directed at Plaintiff, all over the course of nine years. Not one

of the incidents was physically threatening.  Courts have dismissed hostile work environment claims as insufficiently severe and pervasive that are based on a greater number of incidents, including more severe forms of discrimination, over a shorter period.  *See Alfano v. Costello*, 294 F.3d 365, 379 (2d Cir. 2002) (collecting cases); *see Stembridge v. City of N.Y.*, 88 F. Supp. 2d 276, 286 (S.D.N.Y. 2000) (seven racially insensitive comments over three years, including one instance of calling the plaintiff the N word, were not pervasive).

Moreover, Plaintiff has "proffered no evidence that the alleged harassment interfered with [his] job performance, a *sine qua non* of such a claim, notwithstanding that . . . [the] comments may have been offensive."  *Stepheny v. Brooklyn Hebrew Sch. for Special Children*, 356 F. Supp. 2d 248, 265 (E.D.N.Y. 2005) (internal quotation marks and alterations omitted). Accordingly, I find that Plaintiff cannot establish a hostile work environment claim under Title VII, § 1981, or the NYHRL, and Defendants are entitled to summary judgment on those claims.[15]

### C.  Disparate Treatment and Retaliation

Claims of discrimination and retaliation under Title VII are analyzed using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

---

[15] Because I agree with Defendants that Plaintiff has not established sufficiently severe or pervasive workplace harassment, I need not address Defendants' additional arguments regarding Plaintiff's hostile work environment claim.  That said, Defendants misstated the appropriate statute of limitations on Plaintiff's Title VII claim.  "Where a plaintiff's Title VII claim alleges a hostile work environment, the statute of limitations requires that only one alleged discriminatory act demonstrating the challenged work environment occur within 300 days of filing; once that is shown, a court and jury may consider the entire time period of the hostile environment in determining liability."  *Mohan v. City of N.Y.*, No. 17-CV-3820, 2018 WL 3711821, at *12 (S.D.N.Y. Aug. 3, 2018) (internal quotation marks and alterations omitted).  Accordingly, because some of Plaintiff's allegations took place after January 5, 2015, (300 days before Plaintiff filed his EEOC complaint), the pre-January 5, 2015 allegations may be considered on this motion.  But as discussed, even taking into account all of Plaintiff's allegations, he cannot establish a hostile work environment claim.

(1973). *See Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74-75 (2d Cir. 2016) (discrimination claims); *Spencer v. Int'l Shoppes, Inc.*, 902 F. Supp. 2d 287, 293 (E.D.N.Y. 2012) (retaliation claims). Under this framework, a plaintiff bears the initial and minimal burden of establishing a *prima facie* case. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). For a *prima facie* case of discrimination, a plaintiff must demonstrate "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Naumovski v. Norris*, 934 F.3d 200, 214 n.39 (2d Cir. 2019) (internal quotation marks omitted). "[T]o establish a *prima facie* case of retaliation, an employee must show [1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action." *Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 123 (2d Cir. 2008) (internal quotation marks omitted). "[C]laims brought under Section 1981 and the NYHRL are also analyzed using the Title VII framework" laid out in *McDonnell Douglas*. *Dais v. Lane Bryant, Inc.*, 168 F. Supp. 2d 62, 71 (S.D.N.Y. 2001).

Once a *prima facie* case is established, "a rebuttable presumption of discrimination arises" and the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the adverse employment action. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Once the defendant proffers a legitimate, nondiscriminatory reason, the presumption drops away, and the plaintiff must prove that the reason offered by the defendant was not its true reason but rather a pretext for unlawful discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir.

2001). The plaintiff must produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (alterations and internal quotation marks omitted). "To get to the jury, 'it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.'" *Id.* (alterations omitted) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Id.* The ultimate burden of persuasion remains with the plaintiff to show that the defendant intentionally discriminated. *Reeves*, 530 U.S. at 143.

Defendants argue that Plaintiff cannot establish a *prima facie* case, (Ds' Mem. at 18-21), but "[t]he burden of establishing a *prima facie* case is not onerous, and has been frequently described as minimal." *Walsh*, 828 F.3d at 75 (internal quotation marks omitted). And there are circumstances in which a court will presume a plaintiff has established a *prima facie* case and proceed to the next steps of the *McDonnell Douglas* framework. *See id* at 75-76 ("In part because [plaintiff's] burden at the *prima facie* stage is minimal, and because [plaintiff] does not argue that [defendant] failed to proffer a legitimate, nondiscriminatory explanation for its adverse employment action . . . [w]e thus proceed directly to the third step of the *McDonnell Douglas* analysis . . . .") (citation omitted); *Terpstra v. Shoprite Supermarket, Inc.*, No. 17-CV-6840, 2019 WL 3338267, at *5 (S.D.N.Y. July 25, 2019) (collecting cases), *appeal docketed*,

No. 19-2570 (2d Cir. Aug. 16, 2019).  In this case I find it appropriate to skip past the first step of *McDonell Douglas*.[16]

There is no genuine dispute of fact regarding whether Defendants have articulated a legitimate, nondiscriminatory, and nonretaliatory reason for Plaintiff's termination.  Plaintiff was required to attend the Training because his job required him to receive and ship hazardous materials and these aspects of the job were subject to Department of Transportation regulations. (P's 56.1 Resp. ¶¶ 49-51.)  After Plaintiff questioned whether he had to attend, Defendants confirmed that it was mandatory because such training was required every three years, and Plaintiff had not received the Training during that span.  (*Id.* ¶ 52.)  Plaintiff saw the Training announcement, (*id.* ¶ 54), received an email stating that he needed to attend, (*id.* ¶ 58), and was told by his supervisor that the Training was mandatory, (*id.* ¶ 60), yet still did not attend the Training, (*id.* ¶ 61).  Even if Plaintiff never told anyone that he would not attend, which seems doubtful, the undisputed evidence shows that Plaintiff expressed "concerns" about the Training, (*id.* ¶ 57), Defendants discussed between themselves Plaintiff's attendance, (*id.*), and Sowa emailed Plaintiff, stating "I wanted to answer your question about the need of DOT Training for

_____

[16] I note, however, that I could grant summary judgment on the retaliation claims for failure to make out a *prima facie* case based on Plaintiff's failure to respond to a request to admit that said, in substance, that Plaintiff never complained to a supervisor or manager that he was being harassed based on race or another protected characteristic.  (Manfredo Decl. Ex. 8 ¶ 5.) Under Federal Rule of Civil Procedure 36(a)(3), "[a] matter is admitted unless, within 30 days after being served [with a request for admission], the party to whom the request is directed serves on the requesting party a written answer or objection." Fed. R. Civ. P. 36(a)(3).  "A matter admitted under [Rule 36] is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."  *Id.* 36(b).  No such motion has been made here, nor has any explanation for the failure to respond been provided.  Accordingly, I could regard it as conclusively established that Plaintiff failed to complain, *see J&J Sports Prods., Inc. v. Mari*, No. 10-CV-455, 2012 WL 1004842, at *1 (E.D.N.Y. Mar. 23, 2012), and in the absence of evidence of such a complaint, there would be no protected activity for which Plaintiff could have been subjected to retaliation.

you." (Sowa Aff. Ex. 1.) Plaintiff at the very least questioned whether he had to attend, expressed some reluctance, and ultimately did not show up. Further, while Plaintiff denies that he said he "wasn't going to leave" the plant on September 15, 2016, (P's 56.1 Resp. ¶ 70), he does not deny that he was told to leave the plant, (*see id.* ¶¶ 67, 73), and he does not deny that he went to HR instead of leaving, (*id.* ¶¶ 70, 73). In other words, while Plaintiff denies stating he would not leave, he admits that he was told to leave but did not. Failure to attend the Training and failure to leave the plant when directed are acts of insubordination that provide a sufficient nondiscriminatory justification for his termination. *See Silva v. Peninsula Hotel*, 509 F. Supp. 2d 364, 385 (S.D.N.Y. 2007) (plaintiff's insubordinate behavior provides ample justification for adverse employment action); *Ponniah Das v. Our Lady of Mercy Med. Ctr.*, No. 00-CV-2574, 2002 WL 826877, at *9 (S.D.N.Y. Apr. 30, 2002) ("Unwillingness to follow a supervisor's orders is a legitimate nondiscriminatory reason for terminating an employee's employment."), *aff'd sub nom. Das v. Our Lady of Mercy Med. Ctr.*, 56 F. App'x 12 (2d Cir. 2003) (summary order).

Plaintiff's attempt to create a factual dispute by stating that he never intended to skip the Training fails because the issue is not what Plaintiff subjectively intended; it is what Defendants reasonably believed at the time of Plaintiff's termination, and all of the evidence available to Defendants at that time suggested that Plaintiff intended to skip the Training and was insubordinate in doing so. (*See* P's 56. Resp. ¶ 64 (Patinella told Plaintiff that he had to go to the Training, but Plaintiff hung up on Patinella); *id.* ¶ 65 (Dionysius heard Plaintiff say, "I'm not going"); *id.* ¶ 71 (Garrison heard Patinella say to Plaintiff, "What do you mean you're not going to leave? If you want to do it that way, I'll just call the police and have them escort you out of the building, so just get your stuff and go home."); Disciplinary Memo ("[Plaintiff] stated that he

had already attended [the Training], so he did not need to go. [Patinella] then advised [Plaintiff] that the training is a refresher course and as the Team Lead for the Chemical Warehouse, his attendance was mandatory. Still, [Plaintiff] refused, and hung up on his Manager.")). Plaintiff's conclusory assertion that he was not being insubordinate is insufficient on this motion to defeat Defendants' evidence that they had a legitimate, nondiscriminatory reason for terminating Plaintiff. *See Ghirardelli v. McAvey Sales & Serv., Inc.*, 287 F. Supp. 2d 379, 391 (S.D.N.Y. 2003) (no genuine issue of material fact where a plaintiff "pits sworn testimony against speculation, conjecture and self-serving conclusions"), *aff'd sub nom. Ghirardelli v. McAvey Sales & Servs., Inc.*, 98 F. App'x 909 (2d Cir. 2004) (summary order).

Typically, the *McDonnell Douglas* analysis would next shift the burden to Plaintiff to show that the Defendants' legitimate, nondiscriminatory justifications for Plaintiff's termination were mere pretexts for discrimination. "In such situations, plaintiff carries the ultimate burden of persuasion and must produce evidence such that a rational finder of fact could conclude that the adverse action taken against her was more likely than not a product of discriminatory animus." *Kerman-Mastour v. Fin. Indus. Regulatory Auth., Inc.*, 814 F. Supp. 2d 355, 370 (S.D.N.Y. 2011) (internal quotation marks omitted). "Mere speculation is insufficient; a plaintiff must offer specific, admissible evidence of pretext." *Fall v. N.Y. State United Teachers*, 289 F. App'x 419, 421 (2d Cir. 2008) (summary order). But here, Defendants' motion for summary judgment is unopposed, and therefore Plaintiff has not provided any evidence that Defendants' legitimate, nondiscriminatory reason for Plaintiff's termination was pretextual. Accordingly, because Plaintiff has failed to satisfy his burden, Defendants are entitled to summary judgment on Plaintiff's discrimination and retaliation claims. *See Holmes*, 2017 WL 3535296, at *5 ("Plaintiff has failed to respond to Defendants' motion for summary judgment, and therefore, has

not provided any evidence that Defendants' legitimate, non-discriminatory reasons [for the adverse employment action] are pretextual."); *see also Powell v. Consol. Edison Co. of N.Y., Inc.*, No. 97-CV-2439, 2001 WL 262583, at *8 n.10 (S.D.N.Y. Mar. 13, 2001) (where plaintiff failed to respond to proffered legitimate reason with evidence of pretext, court considered claims abandoned and dismissed).

Even assuming Defendants' motion was opposed, Plaintiff still would fail to establish pretext. As Defendants argue, Plaintiff had worked at Chemprene for over two decades, yet no adverse employment action had been taken against him until he did not attend the Training, even though Plaintiff of course had belonged to a protected class throughout his entire employment and even though Plaintiff had complained of discrimination in the workplace dating back to 2007. Further, Plaintiff was the only Chemprene employee whose attendance at the Training was mandatory but who did not attend. (*See* P's 56.1 Resp. ¶¶ 103-105.) Plaintiff therefore cannot identify other similarly situated employees whose absences were excused and has offered no evidence to rebut Defendants' assertion that failure to attend the Training, and subsequent refusal to leave the plant, were fireable offenses. Nor has he pointed to any racist or retaliatory remarks on the part of Patinella or Myers, who made the decision to termination Plaintiff.

The closest Plaintiff's 56.1 Response comes to establishing pretext is the assertion that he complained of Ford's use of the N word two weeks before his termination. But "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013). Accordingly, having offered insufficient evidence to establish that Defendants' termination of Plaintiff was pretextual, Plaintiff cannot

satisfy the third prong of the *McDonnell Douglas* test, and his Title VII, § 1981, and NYHRL discrimination and retaliation claims are dismissed.[17]

IV.    **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is granted. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 62), enter judgment for Defendants, and close the case.[18]

**SO ORDERED.**

Dated:  October 24, 2019
           White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

[17] My ruling with regard to Plaintiff's NYHRL claim applies to all Defendants, as I agree with Defendants that Patinella and Garrison also cannot be found liable as aiders and abettors because Chemprene, the principal actor here, is not liable. *See Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 451 (S.D.N.Y. 2018).

[18] Mr. Santos is directed to supply a copy of this Opinion and Order to Plaintiff, who may not be aware of his lawyer's failings in this case.